# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DUANE LAMONT COLEMAN, ) | |
| ) | Civil Action No. 09 - 1225 |
| Petitioner, ) | |
| ) | District Judge Donetta W. Ambrose |
| v. ) | Magistrate Judge Lisa Pupo Lenihan |
| ) | |
| LOUIS FOLINO, Superintendent of S.C.I. ) | |
| Greene; THE DISTRICT ATTORNEY OF ) | |
| THE COUNTY OF ALLEGHENY; and ) | |
| THE ATTORNEY GENERAL OF THE ) | |
| STATE OF PENNSYLVANIA, ) | |
| ) | |
| Respondents. ) | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION

It is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

### II. REPORT

Petitioner, Duane Lamont Coleman, a state prisoner incarcerated at the State Correctional Institution at Greene located in Waynesburg, Pennsylvania, has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is challenging his conviction and sentence in the Court of Common Pleas of Allegheny County with respect to charges of aggravated assault arising from the April 8, 2003 shootings of David Kormick and Ronald Sams. For the reasons that follow, the Petition should be denied.

#### A. Relevant Facts

The record evidence reveals the following. On April 8, 2003, Ronald Sams was sitting in the living room of his home, located in the Elliot or West End section of the City of Pittsburgh. At

the time, he was watching a movie with his 19-year-old stepdaughter, Lynn Michellissi, his then 16-year-old stepson, David Kormick, and two of David's friends, one of whom was 13 year-old Marshall McDonald. Lynn's infant daughter was near her in a playpen in the living room. At approximately 1:00 a.m., someone knocked on the front door and Marshall went to open it. Standing in front of him was a black male who asked if he could buy some weed. Marshall did not know this man and told him that he did not have weed and that he had the wrong house. When Marshall began to shut the front door the man pushed the door open and pointed a gun in Marshall's face. Upon seeing this, Mr. Sams jumped out of his chair and charged the man in an attempt to get the gun. A struggle ensued and shots were fired. At this point, David ran to help his stepfather and as he pulled him back into the house, more shots were fired from other people outside the home. David and Mr. Sams both suffered gunshot wounds and were taken to Allegheny General Hospital for treatment. Mr. Sams suffered permanent injury to his elbow and is unable to fully use his left arm. A bullet remains in David's thigh and he is no longer able to participate in any physical activity, including sports, exercise, or sexual activity.

Based on the descriptions given by the victims and witnesses and on individuals from the area whom they thought might be involved, police created five photo arrays, each containing eight pictures. Petitioner's photo was not included in any of these arrays. None of the victims or witnesses identified anyone from the arrays. Three or four days after the attack, a neighbor and cousin, Harry Davis, told Mr. Sams that he had received information about who had done the shooting from a woman named Asia Bey and said that he had two photographs to show him. When shown the first picture, Mr. Sams said it was not the assailant. When shown the second photo Mr. Sams recognized the person as his attacker. Mr. Davis told Mr. Sams that the man he had identified

was known as Chico. When Mr. Davis showed Lynn the two pictures he had shown Mr. Sams, she only recognized the one depicting Petitioner.

Based upon this information and identification, the family contacted the police who prepared another photo array. This array consisted of eight individual photos and included Petitioner's picture. When the photos were presented to Mr. Sams, he identified Petitioner as the shooter. None of the other victims or witnesses were able to identify Petitioner from the array. The police also interviewed Asia Bey who reported that on the night of the incident, Petitioner called her boyfriend, JR, and asked to be picked up behind a funeral home on Chartiers Avenue. Ms. Bey went with her boyfriend and once Petitioner got into the car, she asked him what had happened. According to Ms. Bey, Petitioner told her that he and Devon Duel had just attempted to rob a house and that he had had to shoot some of the people in the house.

At trial, Mr. Sams testified that the individual in the second photo shown to him by Mr. Davis was the man who had entered his home. He then identified Petitioner, in court, as the shooter. He also testified that he only saw the shadow of the second assailant who had been outside the home. David testified that he did not get a good look at the attacker's face, but he was able to describe his clothing and the gun. Although Marshall did not make an identification when shown the final array created by the police, he testified that he got a good look at the assailant's face and he identified Petitioner in court as the shooter. Likewise, Lynn was unable to identify anyone from the police array but she identified Petitioner as the attacker both when Mr. Davis showed her his picture and in court. Mr. Sams, Marshall, and Lynn all testified that the assailant was not wearing glasses; David could not recall whether he wore glasses.

Petitioner presented testimony from his wife, Angela Coleman. Mrs. Coleman testified that Petitioner was with her at the time of the incident. Specifically, she stated that on April 7, 2003, she and her husband were together at his sister's house from 9:00 p.m. to 10:30 p.m. and thereafter returned to their home in the Elliot section of the city. She then claimed that they were together in their house for the rest of the night. Mrs. Coleman further stated that Petitioner wears prescription glasses and also wears contact lenses, which they both share. In rebuttal, the Commonwealth offered testimony from Deborah DeSavage, a neighbor of Asia Bey. Ms. DeSavage indicated that on the night in question, her husband received a call about the shooting and rushed out to check on Mr. Sams and David. Although unsure of the exact time, Ms. DeSavage testified that sometime after her husband left, her daughter saw a woman knocking on Ms. Bey's door. The woman, who was with a young girl, wanted to use Ms. Bey's phone but no one was home. Ms. DeSavage stated that she allowed this woman to use her telephone. In court, she identified this woman as Angela Coleman.

Following a non-jury trial, on June 8, 2004, the trial court found Petitioner guilty of one count of burglary and four counts of aggravated assault and imposed an aggregate term of incarceration of from twenty (20) to forty (40) years. Petitioner filed a timely notice of appeal and on July 8, 2005, the Superior Court of Pennsylvania affirmed his judgment of sentence. Petitioner did not file a timely Petition for Allowance of Appeal to the Supreme Court of Pennsylvania.

On February 28, 2006, Petitioner filed a *pro se* petition for relief under the Pennsylvania Post Conviction Relief Act (PCRA), 42 Pa. Cons. Stat. § 9542. Following appointment of counsel a supplemental PCRA petition was filed and a PCRA hearing was held. On June 29, 2007, the PCRA Court denied Petitioner's PCRA Petition. Petitioner filed a timely Notice of Appeal and on

November 13, 2008, the Superior Court of Pennsylvania affirmed the Trial Court's determination denying Petitioner PCRA relief. On May 19, 2009, the Supreme Court of Pennsylvania denied Petitioner's Petition for Allowance of Appeal.

Having completed his collateral attack in the state courts, Petitioner filed with this court a petition for writ of habeas corpus pursuant to 28 U.S.C.§ 2254 raising the following claims.

1. Trial counsel was ineffective in eliciting inadmissible hearsay testimony regarding Asia Bey as to prior bad acts and an alleged inculpatory statement by petitioner.

2. Trial counsel was ineffective for failing to seek suppression of the unreliable and tainted photographic identification.

3. The consecutive sentences were excessive. Inadequate reasons were provided for the aggravated range sentence.

He raised substantially similar claims in his direct appeal and during his PCRA proceeding.

### B. Standard of Review

In describing the role of federal habeas proceedings, the Supreme Court of the United States, in Barefoot v. Estelle, 463 U.S. 880, 887 (1983), noted:

> [I]t must be remembered that direct appeal is the primary avenue for review of a conviction or sentence.... The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials.

In 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), which further "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

Amended Section 2254 of the federal habeas corpus statute provides the standard of review for federal court review of state court criminal determinations and provides, in relevant part, as follows:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.

28 U.S.C.§ 2254(d).

"A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir.2004) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Few state court decisions will be "contrary to" Supreme Court precedent. "Clearly established Federal law" should be determined as of the date of the relevant state-court decision. Greene v. Palakovich, Civil No. 07-2163, 2010 WL 2134575 (3d Cir. May 28, 2010).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct

governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" *Id*. (quoting Williams, 529 U.S. at 407).

Moreover, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence. 28 U.S.C. § 2254(e). Where a state court's factual findings are not made explicit, a federal court's "duty is to begin with the [state] court's legal conclusion and reason backward to the factual premises that, as a matter of reason and logic, must have undergirded it." Campbell v. Vaughn, 209 F.3d 280, 289 (3d Cir. 2000). In determining what implicit factual findings a state court made in reaching a conclusion, a federal court must infer that the state court applied federal law correctly. *Id*. (citing Marshall v. Lonberger, 459 U.S. 422, 433 (1982)). Where the state court fails to adjudicate or address the merits of a petitioner's claims, the federal habeas court must conduct a *de novo* review over pure legal questions and mixed questions of law and fact. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001).

### C. Ineffective Assistance of Counsel

Petitioner's first two claims assert ineffectiveness of trial counsel. The Sixth Amendment right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (*quoting* Strickland v. Washington, 466 U.S. 668, 684 (1984)). *See also* Kimmelman v. Morrison, 477 U.S. 365, 374 (1986) (the essence of a claim alleging ineffective assistance is whether counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect).

7

The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. The first prong of the Strickland test requires a defendant to establish that his attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." *Id*. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. *Id*.

The second prong requires a defendant to demonstrate that counsel's errors deprived him of a fair trial and the result was unfair or unreliable. Strickland, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id*, 466 U.S. at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome. *Id*. A defendant is not entitled to relief unless he makes both showings. *Id*. at 687. The Strickland standard applies equally to appellate counsel. Smith v Robbins, 528 U.S. 259, 285 (2002).

In analyzing Petitioner's claims under the two-part test announced in Strickland, this Court must apply the standards set forth in section 2254(e) concerning the presumption of correctness applicable to state court factual findings. The question of effectiveness of counsel under Strickland

is a mixed question of law and fact; it requires the application of a legal standard to the historical, fact determinations. Berryman, 100 F.3d at 1095. In this regard, a state court's finding that counsel had a trial strategy is a finding of fact to which the presumption applies. *Id*. Likewise, a state court's determination that a decision was a tactical one is a question of fact. *Id*. A state court's determination of whether such strategy or decision was reasonable is a question of law. *Id*. *See also* McAleese v. Mazurkiewicz, 1 F.3d 159, 166 (3d Cir.) ("[A] state court's conclusion that counsel rendered effective assistance is not a finding of fact subject to deference by a federal court."), *cert. denied*, 510 U.S. 1028 (1993).

> 1. Trial counsel was ineffective in eliciting inadmissible hearsay testimony regarding Asia Bey as to prior bad acts and an alleged inculpatory statement by petitioner.

Petitioner's first claim is that trial counsel rendered ineffective assistance by eliciting inadmissible hearsay testimony regarding Asia Bey as to prior bad acts and an alleged inculpatory statement by Petitioner. Ms. Bey did not testify at trial; rather, trial counsel questioned other witnesses about statements Bey allegedly made. On cross-examination at trial, trial counsel elicited from Sams that he had learned that Bey was the individual who had told Davis who the shooter was. Counsel next asked Sams whether Davis told him that Bey had accused Petitioner's sister of robbing her but the charges were dismissed. Counsel further asked if Davis told him that Bey had accused Petitioner of beating his son, Duane Coleman, Junior. On cross-examination of Detective Kramer, Counsel asked if he was aware that Bey had accused Petitioner of beating his son and that a CYF investigation revealed that charge to be unfounded. She further asked if he was aware that Bey had accused Petitioner of beating her up and robbing her and that those charges were dismissed. Counsel further elicited testimony from Detective Kramer that Bey told him that Petitioner called her

9

boyfriend on the night of the incident, and when she and her boyfriend went to pick him up, Petitioner told her that him and Devon Duel just tried to rob a house, and that he had to shoot some people in the house.

The PCRA Court denied Petitioner relief on this claim finding that trial counsel had a reasonable trial strategy in attempting to attack the credibility of the identification. It was her theory and argument that the identification was tainted by Ms. Bey who had ill will toward Petitioner and motive to create a hostile environment to aid in accusing him. Additionally, she argued that it was implausible that, given the history between Bey and Petitioner, that he would have confided in her as to his criminal acts. In reviewing this claim, the trial court made the following determination.

> Counsel did not think that honest mistake would be enough to challenge the victim's testimony so she attempted to show bias on behalf of a third party, a reasonable strategy. However, as this was a bench trial this court can say that the length of time and ability of the victims to observe the attacker rendered their testimony unassailable. Any prejudicial statements that arose during the testimony played no part in this Court's determination.

Doc. No. 6-7, p. 11.

The Superior Court affirmed this determination noting the following.

> At the PCRA evidentiary hearing, [petitioner]'s trial counsel discussed her strategy for eliciting this information:
>
>> A. In my opinion, the entire strength of the charge against Mr. Coleman was the identification; and in my opinion, the identification was so impermissibly tainted that I needed to hammer that point home. I know there was no state action, at least in my opinion. But it struck me that a trier of fact…could reasonably conclude that Asia Bey, out of spite, manufactured that story, passed it on to Mr. Davis, who then tainted the witnesses.

> Q. Would you agree with me that this information—this was essentially a confession by Mr. Coleman coming into evidence?
>
> A. Yes.
>
> Q. And it could be highly prejudicial?
>
> A. Well, yes, but the identification was even more prejudicial to him. And it was a balancing act, and I chose to bring it in just because I believed the identification was so bad that the trier of fact would not have convicted him.
>
> Q. Did you discuss this with Mr. Coleman before?
>
> A. We certainly discussed the facts. I don't know if we discussed it in that kind of detail. I can't remember that.

Counsel indicated that she was aware of the principle that a trial judge, sitting as the trier of fact, is presumed to disregard inadmissible evidence. Counsel wanted the trial court to "consider every aspect of the tainted identification," along with the confession that Bey allegedly heard.

The PCRA court found that counsel had a reasonable strategic basis for attempting to show that the identifications in this case ultimately flowed from Bey, a biased source. Counsel also attempted to show that [Petitioner's] alleged confession to Bey was implausible, given the history of ill-will between them.

The record supports this conclusion. While counsel could have avoided eliciting the confession altogether, counsel's overarching strategy was to show that the primary source of the identification, Bey, was biased and incredible. The court also indicated that as the trier of fact, he disregarded any prejudicial statements that arose during the testimony. The Court is presumed to give proper weight, if any, to an alleged hearsay confession from an allegedly biased source. Unfortunately for [petitioner], the trial court found that "the length of time and the ability of the victims to observe the attacker rendered their testimony unassailable." In summary, counsel's strategy was reasonable, although unsuccessful. Because [petitioner]

> has failed to show that counsel had no reasonable basis for her action, his ineffectiveness claim must fail.

Doc. no. 7-6, pp. 10-12 (internal citations omitted).

In Strickland, the Supreme Court stated that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a defendant must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id.

Here, the state court's decisions are not clearly contrary to federal law as determined by the Supreme Court of the United States. Nor are the state court's decisions an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. In order for Petitioner to succeed on his claims it is not enough to convince a federal court that in its independent judgment the state court applied the law incorrectly, it must have applied the law in an "objectively unreasonable manner." Bell v. Cone, 535 U.S. at 698-699. Petitioner has not made such a showing and, therefore, is not entitled to habeas relief with respect to his first claim.

2.  Trial counsel was ineffective for failing to seek suppression of the unreliable and tainted photographic identification.

Next, Petitioner alleges that trial counsel was ineffective for failing to seek suppression of the unreliable and tainted identifications. In Kimmelman v. Morrison, 477 U.S. 365 (1986), the Court determined that a habeas petitioner could raise a claim of ineffective assistance when his trial counsel failed to file a timely pre-trial motion to suppress evidence allegedly obtained in violation

of the Fourth Amendment. Notwithstanding, the Court instructed that the mere failure to file a timely suppression motion does not constitute *per se* ineffective representation. Kimmelman, 477 U.S. at 383. To demonstrate actual prejudice under the second prong of the Strickland test, a petitioner must prove that the Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence. Kimmelman, 477 U.S. at 375.

At trial, three of the victims and/or witnesses in this case—Mr. Sams, Marshall and Lynn—identified Petitioner as the perpetrator of the alleged crimes. Petitioner argues that these identifications were tainted by the involvement of his neighbor, Harry Davis. The Pennsylvania Superior Court denied this claim as follows.

> . . . In the instant case, on direct appeal, [Petitioner] challenged the sufficiency of the evidence. [Petitioner's] argument was based in large part on the premise raised here: namely, that Davis' actions caused unduly suggestive future identifications.
>
> We rejected this claim, reasoning as follows.
>
> After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the honorable Guido A. DeAngelis, we conclude Appellant's issue merits no relief. The trial court comprehensively discusses and properly disposes of the issues presented. See Trial Court Opinion at 5-6 (noting Appellant did not file a pretrial motion to suppress identification as unduly suggestive, and further finding: 1) suggestiveness in identification process is but one factor in determining reliability of identification evidence; 2) "one on one" identification in this case was not so suggestive as to give rise to irreparable likelihood of misidentification; 3) photo array at issue did not result from state action, where neighbor presented photographs to victim; 4) trial court observed victim's in-court demeanor, candor and ability to answer questions at trial and

> determined victim's in court and photo array identifications were convincing and compelling; and 5) victim's testimony convinced court Appellant was perpetrator of offenses at issue). Accordingly, as to issue one, we affirm on the basis of the trial court's opinion.
>
> Based on this analysis, we conclude that even if [Petitioner's] counsel had moved to suppress the identification, the motion would have failed, and the suppression court's decision would have been upheld on direct appeal. Accordingly, [Petitioner's] claim of ineffectiveness fails for lack of prejudice.

Doc. No. 7-6, pp. 8-9.

Again, Petitioner has not shown that the state courts decisions were clearly contrary to federal law as determined by the Supreme Court of the United States. Nor has he demonstrated that the decisions were objectively unreasonable. Thus, Petitioner is not be entitled to habeas corpus relief with respect to his second claims.

### D. Excessive Sentence

In his final claim, Petitioner claims that his consecutive sentences were excessive and that the trial court gave inadequate reasons for sentencing petitioner in the aggravated range of the sentencing guidelines. Petitioner is not entitled to habeas corpus relief with respect to this claim as he has failed to allege the denial of any federal constitutional right. In this regard, a state prisoner may seek federal habeas corpus relief only if he is in custody in violation of the Constitution or federal law. Smith v. Phillips, 455 U.S. 209 (1982); Geschwendt v. Ryan, 967 F.2d 877 (3d Cir.), *cert. denied*, 506 U.S. 977 (1992); Zettlemoyer v. Fulcomer, 923 F.2d 284 (3d Cir.), *cert. denied*, 502 U.S. 902 (1991). Thus, a writ of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression of federal law binding on the state courts. Engle v. Isaac, 456 U.S. 107, 119 (1982).

Generally, sentencing is a matter of state criminal procedure and does not fall within the purview of federal habeas corpus. Wooten v. Bomar, 361 U.S. 888 (1959). It necessarily follows that a criminal sentence cannot be attacked in a habeas corpus proceeding unless the sentencing court lacked jurisdiction to impose it or committed a constitutional error that made the sentence or underlying conviction fundamentally unfair. United States v. Addonizio, 442 U.S. 178, 186 (1979); Gleason v. Welborn, 42 F.3d 1107 (7th Cir. 1994), *cert. denied*, 514 U.S. 1109 (1995); Bean v. United States, 679 F.2d 683 (7th Cir. 1982). Thus, a federal court will not normally review a state sentencing determination that falls within the statutory limit, Williams v. Duckworth, 738 F.2d 828, 831 (7th Cir. 1984), as the severity of a sentence alone does not provide a basis for habeas relief. Smith v. Wainwright, 664 F.2d 1194 (11th Cir. 1981) (sentence within statutory limits can not be attacked in habeas proceeding); United States v. Myers, 374 F.2d 707 (3d Cir. 1967).

The discussion above makes clear that Petitioner can receive federal habeas corpus relief only if he can show that his sentence violates his constitutional rights. In this regard, the Eighth Amendment prohibits the imposition of cruel and unusual punishments. In Solem v. Helm, 463 U.S. 277, 284 (1983), the United States Supreme Court held that the Eighth Amendment prohibits "not only barbaric punishments, but also sentences that are disproportionate to the crime committed." In so concluding, the court employed a proportionality analysis that weighed the following factors: the gravity of the offense and the harshness of the penalty; a comparison of the sentence imposed for more serious crimes in the same jurisdiction; and a comparison of the sentences imposed for the same crime in other jurisdictions.

Almost a decade later, the Supreme Court decided Harmelin v. Michigan 501 U.S. 957 (1991), which concerned the issue of whether the Eighth Amendment requires a proportionality

15

guarantee in non-capital cases. In Harmelin, the Supreme Court reviewed a claim that the punishment imposed, life in prison without the possibility of parole, was grossly disproportionate to the offense committed, possession of more than 650 grams of cocaine. While Harmelin did not contain a majority opinion with respect to the issue, two justices, Scalia and Rhenquist, concluded that the Eighth Amendment does not contain a proportionality guarantee and, for that reason, the sentence could not be considered to be unconstitutionally disproportionate. Harmelin, 501 U.S. at 995 (concluding that "[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history."). Applying Harmelin, the federal courts have concluded that "only an extreme disparity between crime and sentence offends the Eighth Amendment." United States v. Marks, 209 F.3d 577, 583 (6th Cir. 2000).

In the case at bar, Petitioner does not allege that the sentencing court lacked jurisdiction or committed a constitutional error making the sentence fundamentally unfair. Instead, he complains that the judge should have imposed his sentences to run concurrently instead of consecutively. However, because the imposition of consecutive sentences in Pennsylvania is within the sound discretion of the court,[1] Petitioner's claim does not raise any constitutional question. *See, e.g.*, Souch v. Schaivo, 289 F.3d 616 (9th Cir. 2002) (holding that neither an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list its reasons for imposing consecutive sentences, being errors under state law, could form the basis for federal habeas relief); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994) (concluding,

---

1 *See* Commonwealth v. Burkhardt, 526 Pa. 341, 586 A.2d 375 (1991); Commonwealth v. Hoag, 445 Pa. Super. 455, 665 A.2d 1212 (1995) (generally, in imposing a sentence, court has discretion to determine whether to make it concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed).

where Nevada prisoner challenged state trial court imposition of consecutive sentences without explanation, "[t]he decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus"); Herrera v. Artuz, 171 F.Supp.2d 146 (S.D.N.Y. 2001) (holding that state court's decision to impose consecutive sentences did not warrant federal habeas relief, even where prosecution had recommended concurrent sentences, where sentence was within the range prescribed by state statute and the trial court had discretion to impose consecutive terms).[2] Consequently, Petitioner has failed to show that he is entitled to habeas corpus relief with respect to his sentencing claim.

### E. Certificate of Appealability

Section 2253 generally governs appeals from district court orders regarding habeas petitions. Section 2253(c)(1)(A) provides that an appeal may not be taken from a final order in a habeas proceeding in which the detention arises out of process issued by a State court unless a certificate of appealability has been issued. A certificate of appealability should be issued only when a petitioner has made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2254(c)(2). Here, the record fails to show a violation of Petitioner's constitutional rights. Accordingly, a certificate of appealability should be denied.

### III. CONCLUSION

Based on the discussion above, it is respectfully recommended that the Petition for Writ of Habeas Corpus be denied and that a certificate of appealability be denied.

---

2 Moreover, where the court has discretion to impose concurrent sentences, the failure to warn of its possible imposition does not render a guilty plea involuntary. United States v. Kikuyama, 109 F.3d 536 (9th Cir. 1997); Barbee v. Ruth, 678 F.2d 634, 635 (5th Cir. 1982).

17

In accordance with the applicable provisions of the Magistrate Judges Act [28 U.S.C. § 636(b)(1)(B) & (C)] and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen days from the date of the service of this report and recommendation to file written objections thereto. Any party opposing such objections shall have fourteen days from the date on which the objections are served to file its response. A party's failure to file timely objections may constitute a waiver of that party's appellate rights.

                                      Lisa Pupo Lenihan
                                      United States Magistrate Judge

Dated: June 1, 2010

cc:      Duane Lamont Coleman
         FW-7608
         SCI Greene
         175 Progress Drive
         Waynesburg, PA 15370